UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHAWN KEVIN FROST,

        Plaintiff,

    v.

D. WILCOX, et al.,

        Defendants.

Case No. 17-cv-07228-YGR (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiff Shawn Kevin Frost, a state prisoner currently incarcerated at California State Prison-Sacramento, has filed a *pro se* civil rights action under 42 U.S.C. § 1983. The operative complaint in this action is the amended complaint, in which Plaintiff alleged constitutional rights violations at Pelican Bay State Prison ("PBSP" or "Pelican Bay") where he was previously incarcerated. Dkt. 10 at 3-7.[1] In his amended complaint, Plaintiff has named the following Defendants at PBSP and the California Department of Corrections and Rehabilitation ("CDCR"): Warden Clark E. Ducart; Chief Deputy Warden D. W. Bradbury; Associate Warden C. Olsen; Captain T. S. Buchanan; Lieutenant D. Higgerson; Sergeant J. Schrag; Correctional Officer T. Toussaint; Correctional Counselor II D. Wilcox; Office of Appeals ("OOA") Chief M. Voong; and OOA Captain M. Hodges. *Id.* at 2. Plaintiff has sought declaratory relief and monetary damages. *Id.* at 3, 7. Specifically, Plaintiff's claims stemmed from the named Defendants' alleged retaliation for his filing a CDCR Form 602 inmate appeal ("602 appeal" or "grievance").

In an Order dated January 16, 2019, the Court dismissed Plaintiff's supervisory liability claim against Defendant Ducart without prejudice, and it found Plaintiff's First Amendment claims against the remaining Defendants (hereinafter "Defendants") to be cognizable.

The parties are presently before the Court on Defendants' Motion for Summary Judgment. Dkt. 30. Plaintiff has filed an opposition to Defendants' motion, and Defendants have filed a

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

1  reply. Dkts. 35, 38. Plaintiff has also filed a document entitled, "Plaintiff's Request for

2  Admissions/Consideration of Addendum/Request for Counsel." Dkt. 40.

3      Having read and considered the papers submitted and being fully informed, the Court

4  hereby GRANTS Defendants' motion for summary judgment and DENIES any pending motions

5  as moot.

6  **II.    FACTUAL BACKGROUND[2]**

7      **A.    The Parties**

8      At the time of the events set forth in his amended complaint, Plaintiff was housed in

9  PBSP. Dkt. 10 at 3. Defendants Schrag, Wilcox, Buchanan, Bradbury, Olson, Higgerson, and

10  Toussaint are either current or former PBSP employees. Schrag Decl. at 1:22-23; Wilcox Decl. at

11  1:23-24; Buchanan Decl. at 1:22-23; Bradbury Decl. at 1:24-25; Olson Decl. at 1:23-24;

12  Higgerson Decl. at 1:22-24; Toussaint Decl. at 1:24-25. Defendants Hodges and Voong are

13  employees at the CDCR's OOA in Sacramento. Hodges Decl. at 1:25-27; Voong Decl. at 1:21-23.

14      **B.    Plaintiff's Version**

15      The following background relating to Plaintiff's retaliation claims is taken from the

16  Court's January 16, 2019 Order:

17          Plaintiff alleges that Defendants, officials and employees of PBSP
18          and the CDCR violated his constitutional rights. His claims arise
        from their alleged retaliation for his filing an appeal, log no. PBSP-
19          16-01431, on July 6, 2016 naming several supervisorial and custody
        staff as co-conspirators of malfeasance. Plaintiff alleges that three
20          days later, on July 9, 2016, he was rehoused in a cell "which lacked a
        seat/stool, no desk or table to eat meals [or] write, no electrical power
21          to use his approved personal property . . . and a broken sink . . . ."
        Dkt. 10 at 3. It seems Plaintiff was placed in such inadequate housing
22          for approximately 5 months or until around November 2016 before
        he was "moved back to adequate and appropriate/normal general
23          population housing." *Id.* at 5-6. According to the amended

24  ───────────────

    [2] This Order contains some acronyms or abbreviations. Here, in one place, they are:

25  | | |
|---|---|
26  | 602 appeal | CDCR Form 602 inmate appeal |
| CDCR | California Department of Corrections and Rehabilitation |
| Form 22 | CDCR Form 22 |
27  | IHAs | Inmate Housing Assignments |
| OOA | Office of Appeals |
| PBSP | Pelican Bay State Prison |
28  | SOMS | Strategic Offender Management System |

> complaint, Plaintiff filed another appeal, log no PBSP-16-01584, in
> which he raised his claims in this action. Plaintiff's specific claims
> are as follows: (1) Defendants Schrag, Wilcox, and Buchanan
> retaliated against Plaintiff in violation of his First Amendment rights;
> and (2) Defendants Olsen, Bradbury, Higgerson, Hodges, Voong, and
> Toussaint were aware of the unconstitutional actions but failed to take
> correct action by denying his related grievance, also in violation of
> his First Amendment rights.

Dkt. 11 at 2. To elaborate, Plaintiff's retaliation claims are as follows: (1) against Defendants

Schrag, Wilcox, and Buchanan for their part in placing Plaintiff in cell A2-105 on July 9, 2016 as

punishment for filing PBSP-16-01431; (2) against Defendant Toussaint for refusing to process

Plaintiff's July 17, 2016 CDCR Form 22 ("Form 22"), "Inmate/Parolee Request for Interview,

Item or Service," directly to the warden; and (3) against Defendants Olson, Bradbury, Higgerson,

Hodges, and Voong for being aware of the aforementioned alleged retaliatory actions by others

but failing to take corrective action when they denied his grievances. Dkt. 10 at 3-7.

### C. Defendants' Version

#### 1. Cell Assignments With Inmates L. J. Perry and B. J. Ford in Cell A8-102

"[I]nmate housing assignments are made on the basis of available documentation and

individual case factors." Cal. Code. Regs., tit. 15, § 3269.1. Individual case factors include, but

are not limited to the inmate's history of racial violence, their commitment offense, their

classification score, their custody level, and their disciplinary history. *Id.* "Inmates shall accept

Inmate Housing Assignments ("IHAs") as directed by staff. It is the expectation that all inmates

double cell[.] If staff determine an inmate is suitable for double-celling [. . .] that inmate shall

accept the housing assignment or be subject to disciplinary action for refusing. IHAs shall be

made on the basis of available documentation and individual case factors. Inmates are not entitled

to single cell assignment, housing location of choice, or to a cell mate of their choice." *Id.*, § 3269

(brackets added).

Consistent with the above, at the time of these alleged events, Plaintiff was cleared for

double-celling. Wilcox Decl. at 3:19-21, Ex. A [Chronos of Plaintiff's Classification Hearings

Chair by D. Wilcox]. At the time of these events, Defendant Schrag was a correctional sergeant,

Defendant Buchanan was acting as a correctional captain, and Defendant Wilcox was correctional

counselor supervisor, and all three worked at Facility A. Schrag Decl. at 1:22-25; Buchanan Decl.

at 1:22-25; Wilcox Decl. at 1:23-25.  On June 8, 2016, Plaintiff was housed in Cell A8-102, and his cellmate was Inmate L. J. Perry.  Dewitt Decl., Ex. A [June 8, 2016 Bed Request Batch for Inmate Perry]; Schrag Decl., Ex. A [June 8, 2016 Bed Request Batch for Inmate Perry].  Inmate Perry's move had been requested by D. Martinez, and that move was reviewed and approved by Sergeant E. Enos.  *Id.*  On or about June 15, 2016, inmate B. J. Ford moved into cell A8-102, and became Plaintiff's new cellmate.  Dewitt Decl., Ex. A [June 8, 2016 Bed Request Batch for Inmate Ford]; Schrag Decl., Ex. A [June 8, 2016 Bed Request Batch for Inmate Ford].  Inmate Ford's move had been requested by M. Patsel, and that move was reviewed and approved by J. Preston. *Id.*  Plaintiff had no documented enemy concerns with either Inmate Perry or Inmate Ford.  Dewitt Decl. at 2:17-20.  Defendants Schrag, Buchanan, and Wilcox had no personal involvement in deciding either of these cellmate assignments.  Schrag Decl. at 2:15-20, Ex. A; Dewitt Decl., Ex. A; Buchanan Decl. at 3:21-22; Wilcox Decl. at 2:19-26, Ex. A [Chronos of Plaintiff's Classification Hearings Chair by D. Wilcox].  D. Martinez, E. Enos, M. Patsel, and J. Preston are correctional staff who not parties to this action.

### 2. Plaintiff's Cell Move to Cell A2-105 During Facility A's Bed Compactions

On or about the time of July 1, 2016, Pelican Bay was experiencing an influx of inmate transfers that increased the inmate population in Facility A.  Schrag Decl. at 2:24-28; Buchanan Decl. at 3:10-17.  In order to place Facility A's inmates into available bed space, bed compactions were conducted by correctional staff.  *Id.*  Cell moves are conducted by correctional staff submitting bed batch requests of those inmates that need to be moved.  Dewitt Decl. at 2:3-8; Schrag Decl. at 3:1-8.  Bed requests are entered into Pelican Bay's Strategic Offender Management System ("SOMS") by correctional staff, and those requests were reviewed and approved by correctional sergeants or other supervisorial staff in SOMS.  *Id.*  From July 1, 2016 to July 9, 2016, Facility A processed an estimated 126 inmate moves to compact available bed spaces.  Schrag Decl. at 2:28-3:2.  During this time, in an effort to appropriately house all inmates at Pelican Bay, all vacant cells had to be used, regardless of the functionality of each individual cell's electrical outlets.  Buchanan Decl., Ex. B [Buchanan's Letter Response to Plaintiff's Form 22s].

4

During the compactions in July 2016, correctional staff attempted to assign a new cellmate named Inmate Anthony J. Davis to Plaintiff in Cell A8-102 on or about July 8, 2016. Schrag Decl. at 2:28-3:2; Chen Decl., Ex. A [Frost Depo.] 61:19-25. On July 9, 2016, Officer J. Young, requested that Plaintiff be bed-swapped with Inmate Oliver in A2-105. Dewitt Decl., Ex. B [July 9, 2016 Bed Request Batch]; Schrag Decl. at 3:14-17, Ex. B [July 9, 2016 Bed Request Batch]. The request was reviewed and approved by Sergeant J. Reynoso. *Id.* The Court notes that neither Officer Young nor Sergeant Reynoso are parties in this case.

Overrides in SOMS are required if correctional staff request to move an inmate to a bed inconsistent with their housing factors. Schrag Decl. at 3:10-13; Dewitt Decl. at 2:8-11, 2:23-24. No override was necessary to place Plaintiff into that cell, since it matched his housing factors. *Id.* More specifically, at the time of these events, Cell A2-105 was designated to house general population inmates, which matched Plaintiff's designated level of programming.[3] Schrag Decl. at 4:1-5; Wilcox Decl. at 3:10-16; Buchanan Decl. at 3:23-26; DeWitt Decl. at 2:23-25; Chen Decl., Ex. A [Frost Depo.] at 48:7-10. Plaintiff received the same level of access to programs, services, and activities as he did prior to that cell move. Higgerson Decl. at 4:2-3. During Plaintiff's period of placement in A2-105, Plaintiff kept his appliances and was accommodated by their use in dayroom.[4] Buchanan Decl. at 4:4-5; Chen Decl., Ex. A [Frost Depo.] at 53:16-17.

Defendants Schrag, Buchanan, and Wilcox conducted no personal actions in requesting, reviewing, or approving Plaintiff's July 8, 2016 move to A2-105. Schrag Decl. at 3:14-15; Buchanan Decl. at 3:19-20; Wilcox Decl. at 2:22-26. In any case, Defendant Schrag did not instruct any correctional staff to destroy Plaintiff's property if he did not comply with the move to A2-105. Schrag Decl. at 3:19-23. Plaintiff was not present himself to observe any alleged instruction from Defendant Schrag to prison staff. Chen Decl., Ex. A [Frost Depo.] at 56:3-7.

### 3. Plaintiff's Attempt to Submit Form 22 as Confidential Legal Mail

"Inmates and parolees may request interviews with staff and/or request items and services

---

[3] Plaintiff "disputes that cell A2-105 is a normal general population cell." Dkt. 35 at 11.

[4] Plaintiff disputes that he was allowed to use his typewriter in the dayroom and claims that he was denied "every time he asked for this access." Dkt. 35 at 9.

via a written request process. The objective of timely resolution of routine matters through an effective and non-conflicting communications process shall be facilitated in [title 15, article 8.5][.] Departmental staff shall attempt to resolve inmate and parolee issues expeditiously." Cal. Code. Regs., tit. 15, § 3086(a) (2016). "When seeking response to a written request for an interview, item, or service, the inmate or parolee shall complete the [Form 22] [and deliver] or mail via institutional mail the completed form to any staff member who is able to respond to the issue." Cal. Code. Regs., tit. 15, § 3086(e) (2016). "[The] written request process does not stay the time constraints for filing an appeal, the inmate or parolee is not precluded from filing an appeal on the same issue prior to receiving a response to their written request." Cal. Code. Regs., tit. 15, § 3086(e)(2) (2016).

On or about July 17, 2016, Defendant Toussaint and his partner were processing inmate mail in Building 2. Toussaint Decl. at 2:9-11, 2:23-24. At the time, Defendant Toussaint was newly employed as a correctional officer at CDCR for less than two months. *Id.* Plaintiff approached Defendant Toussaint to submit a Form 22 that detailed Plaintiff's allegations regarding Facility A staff subjecting him to cruel and unusual punishment based on A2-105's lack of electrical power for appliance usage, shelves for his "hygiene-food-etc.," and a desk for writing. Sheldon Decl., Ex. B [Second level Response to PBSP-16-01584]; Chen Decl., Ex. B [Plaintiff's July 17, 2016 Form 22]. Plaintiff requested that Defendant Toussaint submit the Form 22 directly to the warden. Toussaint Decl. at 2:24-26. Defendant Toussaint informed Plaintiff that he would process the Form 22 but that it would possibly be answered before reaching the warden, depending on the issues involved in Plaintiff's request. Toussaint Decl. 2:26-3:2. Defendant Toussaint stated that this process was for the purpose of ensuring the expeditious resolution of inmate issues in Form 22s. *Id.* Dissatisfied, Plaintiff placed the Form 22 in a sealed envelope and requested that Defendant Toussaint process it as confidential legal mail. Toussaint Decl. at 3:3-7. Defendant Toussaint, unsure as to the appropriate procedure for processing a Form 22 through the confidential mailing process, took the envelope to his partner to discuss. Toussaint Decl. at 3:8-10. Defendant Toussaint's partner informed Defendant Toussaint that Form 22s could not be processed through the institution's legal mail. *Id.* Defendant Toussaint returned the sealed

envelope back to Plaintiff.  Toussaint Decl. at 3:10-14.  Defendant Toussaint, in turn, informed

Plaintiff that he could not process his Form 22 as legal mail as submitted.  *Id.*  Plaintiff stated

Defendant Toussaint was denying his right to correspond with the warden.  Toussaint Decl. at

3:14.  Defendant Toussaint replied that Plaintiff could write the warden a letter and submit it as

confidential legal mail for processing, or that Plaintiff could submit a Form 22 through its standard

non-confidential process.  Toussaint Decl. at 3:14-16.  Plaintiff repeated that Defendant Toussaint

had denied his right to correspondence and walked away, which Defendant Toussaint took as

Plaintiff ending the conversation.  Toussaint Decl. at 3:17-18.

### 4. Plaintiff's Grievances Relating to Plaintiff's Allegations of Retaliation

#### a. PBSP-16-01431

On or about June 22, 2016,[5] Plaintiff submitted appeal no. PBSP-16-01431 alleging that

his assignments to Inmate Perry on June 8, 2016, and Inmate Ford on June 15, 2016, were

retaliatory cell assignments by Defendants Schrag and Buchanan, among other individuals, for his

past filed grievances.  Ramos Decl., Ex. D [Third Level Response to PBSP-16-01431].  On July

16, 2016, Sergeant T. Combs interviewed Plaintiff regarding those allegations, during which

Plaintiff stated that he had nothing further to add.  Royal Decl. at 4:21-23; Ramos Decl., Ex. D

[Third Level Response to PBSP-16-01431].  Defendant Buchanan conducted the first level inquiry

and recommended that the appeal be partially granted at the first level of review, based on his

review of Plaintiff's submitted documents in support of the first level grievance, his review of

Plaintiff's central file indicating association with the Del Paso Heights Bloods, Plaintiff's related

Form 22s submitted on the same allegations, and Plaintiff's July 16, 2016 interview by Sergeant

Combs.  Buchanan Decl. at 2:22-28, Ex. A [First Level Response to PBSP-16-01431].  Defendant

Olson reviewed and approved Defendant Buchanan's recommendation at the first level based on

all relevant information provided to the first level inquiry.  Olson Decl. at 2:22-28, Ex. A [First

Level Response to PBSP-16-01431]; Ramos Decl., Ex. D [Third Level Response to PBSP-16-

---

[5] The Court notes that the record contradicts Plaintiff's claim as to the date that he filed
PBSP-16-01431 (he states he filed it on July 6, 2016, *see* dkt. 10 at 3), but there is no need to
highlight such a discrepancy because the actual June 22, 2016 filing date still took place before the
July 9, 2016 cell move.

01431]. Outside of this administrative review and approval, Defendant Olson was not otherwise involved in Plaintiff's housing assignments in June 2016 and had no involvement in assigning Plaintiff to any particular facility, building, or cell. Olson Decl. at 4:1-3. Plaintiff was dissatisfied and sought a second level review. Royal Decl. at 4:25-26, Ex. A [Plaintiff's Pelican Bay Appeals Tracking Log]. Appeals Coordinator A. Sheldon, conducted the second level inquiry and agreed with the first level review in finding that Plaintiff was a documented non-validated Del Paso Heights Bloods associate, and had not been housed with an enemy. Sheldon Decl. at 2:12-24, Ex. A [Second Level Response to PBSP-16-01431]. Appeals Coordinator Sheldon provided her findings and recommendations for Defendant Bradbury's review and approval on behalf of the hiring authority. Sheldon Decl. at 2:24-26, Ex. A [Second Level Response to PBSP-16-01431]; Bradbury Decl. at 2:21-25, Ex. B [Second Level Response to PBSP-16-01431]. Plaintiff remained dissatisfied and submitted the grievance to the CDCR's OOA for a third level of review, where Appeals Examiner J. Dominguez conducted the inquiry and recommended that no modification order was necessary. Hodges Decl. at 3:6-8, Ex. A [Third Level Response to PBSP-16-01431]; Ramos Decl., Ex. A [Plaintiff's Third Level Appeals Tracking Log]. Defendant Hodges reviewed that recommendation, which included consideration of the findings and recommendations of the first and second levels of review, Plaintiff's central file, relevant title 15 sections, and Plaintiff's housing and classification factors, and approved the recommendation that no modification order was necessary; she approved the recommendation on behalf of Defendant Voong, Chief of the OOA. Hodges Decl. at 3:6-10, Ex. A [Third Level Response to PBSP-16-01431]; Voong Decl. at 3:10-14; Ramos Decl., Ex. D [Third Level Response to PBSP-16-01431]. Defendants Hodges and Voong had no involvement in Pelican Bay's housing operations and had no authority to conduct Plaintiff's cellmate assignments or bed moves. Hodges Decl. at 3:19-26; Voong Decl. at 2:21-25. Defendant Voong was not involved in reviewing or approving this grievance, as he designated Defendant Hodges to act on his behalf. Voong Decl. at 3:2-4.

### b. PBSP-16-01584

On or about July 19, 2016, Plaintiff submitted appeal no. PBSP-16-01584 alleging that his cell move to Cell A2-105 was in retaliation for his filing of appeal no. PBSP-16-01431.

Higgerson Decl. at 2:12-16; Sheldon Decl., Ex. B [Second Level Response to PBSP-16-01584].

Of these Defendants, Plaintiff named only Defendants Schrag, Wilcox, and Buchanan, in this

grievance as among those alleged to be responsible for this cell move. *Id.* These allegations were

treated as a staff complaint. Olson Decl. at 3:3-8, Ex. B [First Level Response to PBSP-16-

01584]. Defendant Higgerson conducted the first level inquiry and interviewed Defendant on

August 7, 2016 in relation to this grievance; Defendant Higgerson provided his findings to the

non-staff complaint allegations to Defendant Olson. Higgerson Decl. at 3:2-4:8; Olson Decl. at

3:3-8, Ex. B [First Level Response to PBSP-16-01584]. Defendant Olson reviewed Defendant

Higgerson's recommendation and approved the first level's partial grant of this grievance,

agreeing that staff were found to have not violated CDCR policy. Olson Decl. at 3:5-8, Ex. B

[First Level Response to PBSP-16-01584]. Defendant Olson's approval of this response was

based on a review of the issues contained in Plaintiff's appeal and Defendant Higgerson's August

7, 2016 interview with Plaintiff. *Id.* Defendant Olson had no personal participation in Plaintiff's

housing assignments or moves. Olson Decl. at 4:1-3.

Defendant Higgerson provided his findings and recommendations, that Plaintiff's staff

complaint allegations be denied, to the second level. Sheldon Decl. at 3:4-8, Ex. B [Second Level

Response to PBSP-16-01584]. Defendant Higgerson's recommendation was based on, among

other things, his interviews of Plaintiff, Defendant Schrag, Officer Branion, an inspection of A2-

105, its work order history, and a review of Plaintiff's access to services, programs, and activities.

Higgerson Decl. at 3:2-4:8. That recommendation was reviewed and approved by Appeals

Coordinator A. Sheldon. Sheldon Decl. at 3:4-11, Ex. B [Second Level Response to PBSP-16-

01584]. Appeals Coordinator Sheldon agreed with Defendant Higgerson's recommendation that

there was no evidence of staff wrongdoing, based on information from a review of Plaintiff's

central file and Defendant Higgerson's interviews. *Id.* Appeals Coordinator Sheldon's

recommendation was reviewed and approved by Defendant Bradbury on behalf of the hiring

authority. Bradbury Decl. at 3:7-9, Ex. D. [Second Level Response to PBSP-16-01584]; Sheldon

Decl. at 3:10-12, Ex. B [Second Level Response to PBSP-16-01584]. Plaintiff remained

dissatisfied and submitted his grievance to the CDCR's OOA for a third level review, where

9

Defendant Hodges, as the Appeals Examiner, conducted the inquiry and recommended that no modification order was necessary. Hodges Decl. at 3:12-15, Ex. B [Third Level Response to PBSP-16-01584]; Ramos Decl., Ex. E [Third Level Response to PBSP-16-01584]. Defendant Hodges based her consideration of the findings and recommendations on the institutions' review, Plaintiff's central file, and relevant sections of the California Penal Code, title 15, and the CDCR's Operations Manual. Hodges Decl., Ex. B [Third Level Response to PBSP-16-01584]. Defendant Hodges' recommendation was approved by OOA Acting Chief S. Hemenway and thus Defendant Voong was not involved in reviewing or approving this grievance, as he designated Acting Chief Hemenway to act on his behalf. Hodges Decl. at 3:15-17, Ex. B [Third Level Response to PBSP-16-01584]; Voong Decl. at 3:2-4, 3:24-4:1, Ex. B [Third Level Response to PBSP-16-01584].

### c. PBSP-16-01757

On or about August 2, 2016, Plaintiff submitted appeal no. PBSP-16-01757 alleging Defendant Toussaint had obstructed Plaintiff from pursing his First Amendment right to write Warden Ducart through confidential legal mail. Royal Decl., Ex. D [Second Level Review to PBSP-16-01757]; Olson Decl., Ex. C [First Level Appeal Response to PBSP-16-01757]. Sergeant T. Combs interviewed Plaintiff in relation to this grievance on September 18, 2016 and provided it to the first level. *Id.* At the first level, Captain C. J. Parry conducted the inquiry and provided his recommendation to Defendant Olson that the grievance be denied. Olson Decl. at 3:15-17, Ex. C [First Level Appeal Response to PBSP-16-01757]. Defendant Olson reviewed and approved Parry's recommendation in denying the grievance at the first level, based on a review of Plaintiff's allegations and a review of relevant regulations discussing Form 22 and mailing procedures. *Id.* Defendant Olson had no personal participation in processing this Form 22. Olson Decl. at 4:3-5. Plaintiff was dissatisfied and submitted the grievance for a second level review, which was received on October 4, 2016. Royal Decl. at 5:20-22, Ex. D [Second Level Response to PBSP-16-01757]; Bradbury Decl., Ex. F [Second Level Response to PBSP-16-01757]. Appeals Coordinator K. Royal conducted the second level inquiry by considering all relevant sections of title 15 and the CDCR's Department Operations Manual, and agreed with the first level's response; Appeals Coordinator Royal's recommendation was reviewed and approved by Defendant Bradbury at the

second level on behalf of the hiring authority. Royal Decl. at 5:20-24, Ex. D [Second Level Response to PBSP-16-01757]; Bradbury Decl. at 3:22-24, Ex. F [Second Level Response to PBSP-16-01757]. Plaintiff remained dissatisfied and appealed to the third level of review, where Appeals Examiner J. Vila conducted the inquiry and recommended that no modification order was necessary. Voong Decl. at 4:3-4, Ex. C [Third Level Response to PBSP-16-01757]; Ramos Decl., Ex. F [Third Level Response to PBSP-16-01757]. That recommendation was reviewed and approved by OOA Acting Chief R. Briggs, whom Defendant Voong designated to review on his behalf. Voong Decl. at 4:5-9; Ramos Decl. Ex. F [Third Level Response to PBSP-16-01757]. Defendant Voong was not involved in reviewing or approving this grievance. Voong Decl. at 3:2-4, 4:5-8.

## III.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over

material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). Submitted by Defendants in support of the motion for summary judgment are Plaintiff's deposition (Dkt. 34-2 at 111-115, Chen Decl., Ex. A) as well as declarations and all attached exhibits from the following: OOA Chief T. Ramos; PBSP Appeals Coordinators A. Sheldon and K. Royal; Deputy Attorney General Joanne Chen; and Defendants Voong, Hodges, Bradbury, Olson, Wilcox, Buchanan, Higgerson, Schrag, and Toussaint. Dkts. 31-1 – 31-3, 34-1 – 31-2 at 106. Meanwhile, Plaintiff has filed his verified amended complaint (dkt. 10) and his verified opposition to Defendants' motion (dkt. 35). The Court will construe these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995). Finally, Plaintiff has submitted various exhibits and declarations filed in support of his opposition. Dkt. 38-1. Defendants have filed objections to Plaintiff's evidence in support of his opposition. Dkt. 38-1 at 1-7. Defendants assert some of Plaintiff's supporting exhibits and declarations either: (1) lack a foundation of personal knowledge or expertise; (2) show that Plaintiff is not an expert with knowledge as to the information contained in the exhibit; (3) constitute speculation; (4) contain inadmissible hearsay; (5) have not been authenticated; and (6) are irrelevant and outside the scope of this action. Although the Court may discuss some of Plaintiff's evidence in question in its analysis, the Court points out within its analysis why this evidence is not sufficient to defeat summary judgment. The Court finds that even if any of Plaintiff's aforementioned evidence was admitted and accepted at face value, Defendants still would be entitled to judgment as a matter of law, as set forth below. Accordingly, Defendants' objections are DENIED as moot. Dkt. 38-1.

## IV. DISCUSSION

Plaintiff cites the First Amendment and alleges in his complaint that Defendants' actions were in retaliation for Plaintiff submitting formal grievances. Dkt. 10 at 3. Specifically, Plaintiff states retaliation claims: (1) against Defendants Schrag, Wilcox, and Buchanan for their part in placing Plaintiff in cell A2-105 on July 9, 2016 as punishment for filing PBSP-16-01431; (2) against Defendant Toussaint for refusing to process Plaintiff's July 17, 2016 Form 22 directly to the warden; and (3) against Defendants Olson, Bradbury, Higgerson, Hodges, and Voong for being aware of the aforementioned alleged retaliatory actions by others but failing to take corrective action when they denied his grievances. Dkt. 10 at 3-7.

Retaliation by a state actor for the exercise of a constitutional right is actionable under section 1983, even if the act, when taken for different reasons, would have been proper. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977). Retaliation is actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights, even though retaliation is not expressly referenced in the Constitution. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). *Accord Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (prisoner suing prison officials under section 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline); *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (per curiam) (same); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (contention that actions "arbitrary and capricious" sufficient to allege retaliation). The prisoner must show that the type of activity he was engaged in was constitutionally protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory action, and that the

retaliatory action advanced no legitimate penological interest. *Hines v. Gomez*, 108 F.3d 265, 267-68 (9th Cir. 1997).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)) (brackets added). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.*

### A. Alleged Retaliation By Defendants Schrag, Wilcox, and Buchanan In Moving Plaintiff to Cell A2-105

To reiterate, Plaintiff alleges that he was placed in cell A2-105 as punishment for filing a grievance, log no. PBSP-16-01431, naming several supervisorial and custody staff as co-conspirators of malfeasance. Dkt. 10 at 3. In its Order of Service, the Court found that Plaintiff's aforementioned allegations raised a cognizable retaliation claim against Defendants Schrag, Wilcox, and Buchanan in violation of his First Amendment rights. Dkt. 11 at 2.

Defendants maintain that Plaintiff's move to cell A2-105 was "for reasons unrelated to Plaintiff's grievance activities" and instead it was because "Facility A was experiencing an increased number of inmate transfers and needed to compact beds in order to accommodate the institution's goal of efficient use of bed space and accommodating the program needs of Facility A's inmates." Dkt. 30 at 21 (citing Schrag Decl. at 2:24-28; Buchanan Decl. at 3:10-17). Thus, Defendants argue "Plaintiff's claims of retaliation against [them] fail as he cannot establish that his cell move during bed compactions advanced no legitimate correctional goal of the institution." *Id.* at 22.

As to the first and second elements of retaliation listed above, Plaintiff claims that Defendants Schrag, Wilcox, and Buchanan took the following adverse actions against him because after he filed PBSP-16-01431: (1) he was rehoused on July 9, 2016 in cell A2-105 "which lacked a seat/stool, no desk or table to eat meals [or] write, no electrical power to use his approved personal property . . . and a broken sink . . . ," dkt. 10 at 3; and (2) Plaintiff was placed in such inadequate

housing for approximately 5 months or until around November 2016 before he was "moved back to adequate and appropriate/normal general population housing," *id.* at 5-6. In contrast, Defendants argue that their actions were not adverse to Plaintiff, stating as follows:

> Plaintiff alleges that the cell move was adverse because he was a general population inmate and A2-105 was a "management cell." (Pl.'s First Amended Compl., ECF No. 10.) Plaintiff cannot provide a consistent account of what he means by "management cell," but concedes he learned about the "management" term through "random people in prison." (Chen Decl. Ex. A [Frost Depo.] at 53:6-12.) There can be no dispute that A2-105, was designated for general population inmates, and that Plaintiff was a general population inmate. [Schrag Decl. at 4:2-3; Wilcox Decl. at 3:11-13; Buchanan Decl. at 3:23-25; DeWitt Decl. at 2:24-25:; Chen Decl., Ex. A [Frost Depo.] at 48:7-10.] No override was necessary to move Plaintiff into A2-105 and the cell was further appropriate for Plaintiff's placement in that it matched all of his housing factors. [Schrag Decl. at 3:10-13; Dewitt Decl. at 2:8-11; 23-24.] Plaintiff was confirmed to have received the same level of access to programs, services, and activities in A2-105 as he did prior. [Higgerson Decl. at 4:2-3.]
>
> And to the extent that Plaintiff is alleging physical plant defects in A2-105 constituted adverse action, this argument must again fail, because inmates have no expectation to be housed in a particular cell. *See* Cal. Code. Regs., tit 15, § 3269 (2016) (stating that inmates are not entitled to a housing location of their choice). It is further undisputed that during his inquiry of Plaintiff's administrative grievance, Defendant Higgerson also placed work orders to help remedy physical plant defects to restore the cell's electrical use after Plaintiff complained about them. (Higgerson Decl. at 3:2-4:8.) Moreover, Defendant Higgerson, in conducting his inquiry, offered Plaintiff the possibility of potentially being able to move to another cell if Plaintiff could find someone he was willing to cell with, and Plaintiff refused. [Higgerson Decl. at 2:26-3:1.] During this time, Plaintiff kept his appliances and was accommodated by their use in the dayroom. [Buchanan Decl. at 4:4-5; Chen Decl., Ex. A [Frost Depo.] at 53:16-17.] Plaintiff eventually moved to another cell on October 26, 2016. (Buchanan Decl., Ex. D [Plaintiff's Bed Assignment History].)

Dkt. 30 at 23-24 (brackets added).

Nevertheless, Plaintiff points out that after he was assigned to cell A2-105, he "requested, several times, to be allowed use of his typewriter for an hour in the dayroom, every third day, but was denied, each, and every time he asked for this access." Dkt. 35 at 9. Moreover, Plaintiff "disputes that cell A2-105 is a normal general population cell." *Id.* at 11. Plaintiff claims that cell A2-105 "serves as a punishment cell, worse than the security housing unit, or administrative segregation, because an inmate does not have electrical power to utilize his otherwise authorize

personal appliances, as Plaintiff did." *Id.* Plaintiff adds that "Defendants Schrag, Buchanan and Wilcox conducted these cell moves in retaliation to punish Plaintiff for his willingness to file CDCR 602 [appeals] . . . ." *Id.* at 5. The Court finds that such action could be sufficient to constitute adverse action. *See e.g.*, *Rhodes*, 408 F.3d at 568 (noting that arbitrary confiscation and destruction of property, initiation of a prison transfer, and assault in retaliation for filing grievances was sufficient to plead an adverse action); *Pratt*, 65 F.3d at 806 (re-affirming that an allegation of retaliatory prison transfer and double-cell status sufficiently states a claim of retaliation). Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence. *See Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003). In the instant matter, Plaintiff has shown that his July 9, 2016 cell move to cell A2-105 occurred *after* he filed PBSP-16-01431. Dkt. 10 at 3.

As to the third of the above-referenced five elements, Plaintiff has submitted evidence sufficient to show the asserted retaliatory cell move on July 9, 2016 occurred *after* he filed PBSP-16-01431. Dkt. 10 at 3. Prisoners may not be retaliated against for exercising their "First Amendment right to pursue civil rights litigation in the courts." *See Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). The right of access to the courts extends to established prison grievance procedures. *See Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004).

With respect to the fourth element, although Plaintiff must show his First Amendment rights were "chilled," a prisoner need not show a total chilling of his First Amendment rights in order to establish a retaliation claim. *See Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate failed to state retaliation claim where, after alleged adverse action, plaintiff nonetheless had been able to file inmate grievances and lawsuit). Here, Plaintiff has alleged that after he filed PBSP-16-01431, he was moved to cell A2-105, which lacked certain items, like a seat/stool, a desk/table, electrical power, and a working sink. *See* Dkt. 10 at 3. Such action is sufficient to chill Plaintiff's First Amendment Rights, irrespective of whether Plaintiff was actually inhibited. *See Rhodes*, 408 F.3d at 569.

Lastly, for his retaliation claim to survive, Plaintiff must also prove the fifth element, i.e., that there was no legitimate penological reason supporting Plaintiff's cell move to A2-105. *See*

16

*Rhodes*, 408 F.3d at 567-68. As explained above, Defendants argue that based on the evidence "Pelican Bay advanced a legitimate goal of the institution when Facility A staff moved Plaintiff to cell A2-105." Dkt. 30 at 21-22. Defendants elaborate on this as follows:

> Contrary to Plaintiff's claims, his move to A2-105 was in fact for reasons unrelated to Plaintiff's grievance activities. It is undisputed that, at the time of these events, Facility A was experiencing an increased number of inmate transfers and needed to compact beds in order to accommodate the institution's goal of efficient use of bed space and accommodating the program needs of Facility A's inmates. [Schrag Decl. at 2:24-28; Buchanan Decl. at 3:10-17.] Plaintiff's move to A2-105 was one among an estimated 126 bed moves conducted during these July 2016 bed compactions. [Schrag Decl. at 2:28-3:2.] All vacant cells had to be utilized to accommodate institutional and program needs on Facility A, regardless of whether electrical outlets were available in each one. [Buchanan Decl., Ex. B [Buchanan's Letter Response to Plaintiff's Form 22s].] The impetus behind Plaintiff's particular bed move to A2-105—during these bed compactions occurred by Plaintiff's objection to a newly assigned cellmate, Inmate Davis. [Chen Decl., Ex. A [Frost Depo.] at 61:24-25.] Plaintiff's July 9, 2016 refusal thereby prompted the need for staff to identify other housing arrangements for him, as he was explicitly refusing to cooperatively house with another inmate. This resulted in Officer J. Young requesting a bed swap for Plaintiff, then-housed in A8-102, with Inmate Oliver, then-housed in Cell A2-105. [Dewitt Decl., Ex. B [July 9, 2016 Bed Request Batch]; Schrag Decl. at 3:14-17, Ex. B [July 9, 2016 Bed Request Batch].] Plaintiff's claims of retaliation against Defendants fail as he cannot establish that his cell move during bed compactions advanced no legitimate correctional goal of the institution.

Dkt. 30 at 21-22 (brackets added).

However, Plaintiff claims that he "disputes any of Defendants' claims that these [cell] moves were done for legitimate institution goals, and [he] reiterates the fact that Defendants' sole purpose was to cause harm, harass, and chill Plaintiff from exercising his First Amendment right secured by the United States Constitution." Dkt. 35 at 16. Specifically, Plaintiff claims that the "[cell] swap of A2-105 occupied by Inmate Oliver on July 9, 2016 to A8-102 occupied by Plaintiff was vengeful and retaliatory," stating as follows:

> By swapping Plaintiff with [inmate] Oliver, who had no electrical appliances, to cells that contradict each other's need[s], was simply, and obviously malicious, and spiteful, because the lack of electrical power, inmate Oliver did not need, because he had no appliances, at the time. Everyone knew why the cell move was done, because Plaintiff had filed several complaints on staff, which they were very hostile in their dealings with him, and all the inmate[s] knew.

Dkt. 35 at 16-17 (citing Pl.'s Exs., Inmate Anthony J. Davis Decl. (dkt. 35-1 at 58-60) and Inmate Henry Albanez (dkt. 35-1 at 64)) (brackets added). Inmate Albanez, who was housed next door in A2-103, states under penalty of perjury as follows:

> . . . I personally observed cell #105 while Mr. Frost was housed and assigned to that cell, which was in no way similar to [Inmate Albanez's] assigned cell and all other cells. The cell Mr. Frost was assigned had no seat, no desk, not even a mirror, or electrical power to plug-in appliance[s], which Mr. Frost had in his possession inside the cell by was unable to utilize.

Dkt. 35-1 at 64. Meanwhile, Inmate Davis, who was originally assigned as Plaintiff's cellmate in cell A8-102 on July 8, 2016 (when he was moved from A6-103 to A8-102), states under penalty of perjury as follows:

> After arriving at cell #102, I spoke to Mr. Frost and immediately learned that we were incompatible due to religious beliefs, geographical areas of contrast, because I snore loud, and finally because of my "alleged," street gang affiliation, "Blood," which the CDCR has erroneously labeled me and has failed to correct thus far! Mr. Frost, stated adamantly that he is non-affiliated with any street gangs and does not want to be celled up with anyone that is. I communicated all of this information to Correctional Officer Guietierrez [sic], the "A" yard, Bldg. #6, floor office that escorted me to Bldg. 8. He stated, "I don't care. You don't have a choice! Are you refusing to go into the cell with him? I could not refuse because to do so I knew would result in a serious rules violation report (CDCR [Form] 115) and that would have ruined my chances at a transfer to a prison closer to Sacramento, where my mom lives. She's d[y]ing of kidney failure and I'm trying to see her again before she dies. Ultimately, Mr. Frost and I were "forced" under duress and fears of retaliation/reprisal by Correctional Staff here at PBSP, to cell up together. At approx.. 1:04 PM on 7/8/2016, they released Bldg. #8 "A" yard for afternoon yard. I went immediately out to the program office and spoke to a Sgt. For unknown reasons, the Sgt. moved Frost to A Yard's Bldg[.] #2, Cell #105. That cell has no electrical power system, no mirror . . . .

Dkt. 35-1 at 58-59 (brackets added).

Defendants argue that based on Inmate Davis's declaration, the record shows that on July 8, 2016, "there was a legitimate correctional goal in separating Plaintiff and his cellmate in cell A8-102, which resulted in Plaintiff being moved to cell A2-105 (and Inmate Oliver being moved to cell A8-102 with Inmate Davis)." Dkt. 38 at 5. Defendants argue as follows:

> Plaintiff does not dispute that Facility A was conducting bed compactions in July 2016, during which Facility A staff were directed to utilize all available bed space in the most efficient way possible.

18

(Schrag Decl. at 2:28-3:2, Buchanan Decl., Exh. B.) Utilizing available bed space is a legitimate penological interest.

Prison officials also have a legitimate interest in the safety and security of inmates and the institution—interests that were advanced by Plaintiff's transfer from cell A8-102 to cell A2-105, which was prompted by information received by staff that Plaintiff was incompatible with his cellmate in cell A8-102. Indeed, Plaintiff's own evidence—the declaration of his former cellmate Anthony Davis—demonstrates that Plaintiff's move from cell A8-102 was performed in furtherance of the safety and security of inmates and the institution.

Dkt. 38 at 4-5. Defendants point out that Inmate Davis recount of his July 8, 2016 encounter with Plaintiff, who stated he did not want to be in the same cell as Inmate Davis once they "learned that [they] were incompatible due to religious beliefs, geographical areas of contrast, because [Inmate Davis] snore[d] loud[ly], and finally because of [Inmate Davis's] 'alleged,' street gang affiliation[.]" *Id.* at 5 (quoting Dkt. 35-1 at 58).

Under *Rhodes*, the Court finds that Plaintiff has failed to show that the adverse action he suffered was because of his protected conduct, i.e., filing PBSP-16-01431. *See* 408 F.3d at 567-68. Further, the only non-speculative assertion which Plaintiff could rely upon to link his conduct to Defendants' adverse action of moving him cell A2-105 is that cell move occurred *after* Plaintiff filed PBSP-16-01431. But retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this"). Plaintiff has not shown a nexus here. Furthermore, Plaintiff has presented no facts indicating Defendants knew about PBSP-16-01431. Mere speculation that Defendants Schrag, Wilcox, and Buchanan must have acted out of retaliation because they knew about PBSP-16-01431 is not sufficient. *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citing cases) (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit). Although Plaintiff alleges that he submitted PBSP-16-01431 on July 6, 2016, just three days before his July 9, 2016 move to A2-105, it appears in the actual grievance documents that he in fact submitted it on or about June 22, 2016. *See* Ramos Decl., Ex. D [Third Level Response to PBSP-16-01431]. The

July 6, 2016 date more accurately reflects the date in which the Appeals Office assigned it to the Associate Warden's Office for the first level response. *See* Olson Decl. Ex. A [First Level Response to Appeal Log No. PBSP-16-01431]. In any case, Defendants argue that they "could not have known about that appeal since the first level's inquiry began on July 16, 2019." Dkt. 30 at 15 (citing Royal Decl. at 4:21-23; Ramos Decl., Ex. D [Third Level Response to PBSP-16-01431]). Defendants further argue as follows:

> By the time Lieutenant Combs started his investigations into Facility A, Plaintiff was already housed in A2-105. [Dewitt Decl., Ex. B [July 9, 2016 Bed Request Batch]; Schrag Decl. at 3:14-17, Ex. B [July 9, 2016 Bed Request Batch]; Royal Decl. at 4:21-23; Ramos Decl., Ex. D [Third Level Response to PBSP-16-01431].] Because of the aforementioned events—that were independent from his grievance activity—Plaintiff would have been moved to A2-105 even without his submission of that appeal.

Dkt. 30 at 22-23 (brackets added).

Additionally, even if Plaintiff could show he was moved to cell A2-105 as retaliation for exercising protected conduct, he cannot show that Defendants' actions did not reasonably advance the legitimate penological goal of utilizing all available bed space in the most efficient way possible, as well as ensuring safety and security of inmates and the institution due to incompatibility of the cellmates. It is undisputed that, at the time of these events, Facility A was experiencing an increased number of inmate transfers and needed to compact beds in order to accommodate the institution's goal of efficient use of bed space and accommodating the program needs of Facility A's inmates. *See* Schrag Decl. at 2:24-28; Buchanan Decl. at 3:10-17. Plaintiff's move to cell A2-105 was one among an estimated 126 bed moves conducted during these July 2016 bed compactions. *See* Schrag Decl. at 2:28-3:2. All vacant cells had to be utilized to accommodate institutional and program needs on Facility A, regardless of whether electrical outlets were available in each one. *See* Buchanan Decl., Ex. B [Buchanan's Letter Response to Plaintiff's Form 22s]. Finally, Defendants have pointed out and the evidence shows that that the "impetus behind Plaintiff's particular bed move to A2-105—during these bed compactions occurred by Plaintiff's objection to a newly assigned cellmate, Inmate Davis." Dkt. 30 at 22 (citing Chen Decl., Ex. A [Frost Depo.] at 61:24-25) ; Dkt. 38 at 4-5 (citing Dkt. 35-1 at 58 [Davis

Decl.]) Thus, the evidence shows that Plaintiff's July 9, 2016 objection to be housed with Inmate Davis thereby prompted the need for staff to identify other housing arrangements for him. *See* Dkt. 35-1 at 58-59. This resulted in Officer Young requesting a bed swap for Plaintiff (in A8-102) with Inmate Oliver (in Cell A2-105). *See* Dewitt Decl., Ex. B [July 9, 2016 Bed Request Batch]; Schrag Decl. at 3:14-17, Ex. B [July 9, 2016 Bed Request Batch]. Therefore, Plaintiff has not carried his burden of pleading and proving the last *Rhodes* factor—that his cell move did not reasonably advance a legitimate correctional goal.

Having viewed the evidence in the light most favorable to Plaintiff, the Court finds that he has failed to produce specific evidence to show that a genuine issue of material fact exists as to his retaliation claim against Defendants for allegedly moving him to cell A2-105 as punishment for filing PBSP-16-01431. Accordingly, these Defendants Schrag, Wilcox, and Buchanan are entitled to summary judgment on Plaintiff's First Amendment claim. Therefore, the Court GRANTS Defendants' motion for summary judgment as to this claim.

**B.**   **Defendant Toussaint's Alleged Retaliation Against Plaintiff for Refusing to Process Plaintiff's July 17, 2016 Form 22 Directly to the Warden**

Plaintiff next claims that Defendant Toussaint retaliated against him by refusing to process Plaintiff's July 17, 2016 Form 22 directly to the warden. Dkt. 10 at 6-7. Meanwhile Defendants argue that Plaintiff's claims against Defendant Toussaint "necessarily fail because Defendant Toussaint was acting with a legitimate penological purpose in returning Plaintiff's July 17, 2016 Form 22." Dkt 30 at 24-25. Defendants argue as follows:

> It is undisputed that Defendant Toussaint first gave Plaintiff the explanation that Form 22s were intended to resolve inmates' requests expeditiously so it would not necessarily reach the warden's level for resolution. [Toussaint Decl. at 2:26-3:1.] In providing this explanation, Defendant Toussaint was reiterating the purpose of Form 22s, as articulated in title 15, wherein departmental staff must work to expeditiously resolve those inmate issues submitted through written request by providing the Form 22 to any staff who is able to respond to the issue. [Toussaint Decl. at 2:19-21; Cal. Code Regs. tit. 15, § 3086(a) (2016).] Moreover, when Plaintiff apparently attempted to circumvent this process by sealing the Form 22 into an envelope for processing as confidential legal mail, Defendant Toussaint went to ask his mail processing partner if such a request was possible. [Toussaint Decl. at 3:8-10.] When he was informed that it was not, Defendant Toussaint provided the Form 22 back to Plaintiff with added information that Plaintiff could submit an addressed letter to

> the warden through confidential legal mail, or submit the Form 22 through its usual non-confidential process. [Toussaint Decl. at 3:8-16.]

*Id.* (brackets added). Defendants further argue that "Defendant Toussaint, by returning the Form 22 and encouraging Plaintiff follow the appropriate Form 22 procedures, as detailed in title 15, section 3086, was acting in furtherance of a legitimate penological goal detailed in California's regulations." *Id.* at 25.

Here, even if Plaintiff could show that Defendant Toussaint's aforementioned actions were in retaliation for exercising protected conduct, Plaintiff cannot show that Defendant Toussaint's actions of encouraging Plaintiff follow the appropriate Form 22 procedures (as explained in Section 3086 of Title 15 of the California Code of Regulations) was in furtherance of a legitimate penological goal. Therefore, Plaintiff has not carried his burden of pleading and proving the last *Rhodes* factor—that Defendant Toussaint's actions did not reasonably advance a legitimate correctional goal.

Having viewed the evidence in the light most favorable to Plaintiff, the Court finds that he has failed to produce specific evidence to show that a genuine issue of material fact exists as to his retaliation claim against Defendant Toussaint for his alleged refusal to process Plaintiff's July 17, 2016 Form 22 directly to the warden. Therefore, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### C. Defendants Olson's, Bradbury's, Higgerson's, Hodges's, Voong's Alleged Retaliatory Actions in Reviewing Plaintiff's Grievances

Finally, Plaintiff claims that Defendants Olson, Bradbury, Higgerson, Hodges, and Voong were aware of retaliatory actions by others, but failed to take corrective action when they denied his grievances. Dkt. 10 at 4-7.

As against Defendant Olson, Plaintiff's claim is based only on Defendant Olson's apparent participation in reviewing the related grievances: PBSP-16-01431, PBSP-16-01584, and PBSP-16-01757. Dkt. 10 at 5-6. Defendant Olson's approvals to the recommended responses, to the three grievances at issue in this case, were given to Plaintiff after a methodical consideration of the inquiry's findings and proposed recommendations. *See* Olson Decl. at 3:5-8, 3:15-17, 3:21-28, Ex. A [First Level Response to PBSP-16-01431], Ex. B [First Level Response to PBSP-16-

01584], Ex. C [First Level Response to PBSP-16-01757]; Ramos Decl., Ex. D [Third Level Response to PBSP-16-01431].

Meanwhile, Plaintiff's claim against Defendant Bradbury is based solely on his involvement in the institution's second level review of Plaintiff's grievances.  Dkt. 10 at 5.  Defendant Bradbury's involvement in these events was restricted only to approving and signing Pelican Bay's Appeals Coordinators' recommended second level responses, on behalf of the hiring authority.  *See* Sheldon Decl. at 2:24-26, 3:10-12, Ex. A [Second Level Response to PBSP-16-01431], Ex. B [Second Level Response to PBSP-16-01584]; Bradbury Decl. at 2:22-24, 3:7-9, 3:22-24, Ex. B [Second Level Response to PBSP-16-01431], Ex. D. [Second Level Response to PBSP-16-01584];  Royal Decl. at 5:22-24, Ex. D [Second Level Response to PBSP-16-01757].  These approvals were given only after the Appeals Coordinators reviewed all submitted and relevant documents and information for each of Plaintiff's allegations.  *See* Sheldon Decl. at 2:11-24, 3:4-8, Ex. A [Second Level Response to PBSP-16-01431], Ex. B [Second Level Response to PBSP-16-01584]; Royal Decl. at 5:20-22, Ex. D [Second Level Response to PBSP-16-01757]; Bradbury Decl., Ex. F [Second Level Response to PBSP-16-01757].

As against Defendant Higgerson, Plaintiff alleges that Defendant Higgerson's administrative involvement into the first level grievance response to PBSP-16-01584 should have led to the discovery of actual knowledge indicating Facility A staff's retaliatory intent in Plaintiff's housing placement into A2-105. Dkt. 10 at 4-5.  Defendant Higgerson was assigned to conduct the interview of Plaintiff and the first level inquiry to PBSP-16-01584, and Defendant Higgerson based his recommended response on information obtained through interviews with Plaintiff and pertinent key witnesses, a visual inspection of A2-105, and his review of the work order logs for that cell.  Higgerson Decl. at 2:12-16, 3:2-4:8; Sheldon Decl., Ex. B [Second Level Response to PBSP-16-01584].

Plaintiff's claims against Defendants Hodges and Voong, who work for the OOA in Sacramento, relate to their alleged retaliatory denial of his grievances at the third level of appeal.  Dkt. 10 at 6.  Defendant Hodges was not involved in the Pelican Bay's housing operations and had no authority to conduct Plaintiff's cellmate assignments or bed moves.  Hodges Decl. at 3:19-26.

Defendant Hodges' involvement is only in a retrospective administrative capacity as an Appeals Examiner (and an episodic designated equivalent of Defendant Voong), and her third level examination of PBSP-16 01431, and her review and approval of the third level response to PBSP-16-01584, included considerations of the findings and recommendations of all levels of review, relevant statutory and regulatory authority, departmental operations, and other facts relevant to Plaintiffs' grievances. *See* Hodges Decl. at 3:8-10, Ex. A [Third Level Response to PBSP-16-01431], Ex. B [Third Level Response to PBSP-16-01584]; Ramos Decl., Ex. D [Third Level Response to PBSP-16-01431]. Meanwhile, it is undisputed that Defendant Voong did not personally review or approve the third level responses to the grievances at issue, as the record shows that Defendant Voong designated other OOA staff to approve and sign those third level responses on his behalf. *See* Voong Decl. at 3:2-4.

Defendants argue that their involvement in the review and resolution of inmate grievances, without more, is not actionable under section 1983. Dkt. 30 at 25-28 (citing *Shallowhorn v. Molina*, 572 Fed. Appx. 545, 547 (9th Cir. 2014) (claims against defendants involved in appeals process properly dismissed because "inmates lack a separate constitutional entitlement to a specific grievance procedure"); *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (same)). However, during its initial review of Plaintiff's claims, the Court determined that Plaintiff had stated a cognizable claim by alleging that Defendants' denials of his appeals violated his rights under the First Amendment because they had the authority to remedy the alleged violations but failed to do so. Dkt. 11 at 2.

However, viewing the evidence in the light most favorable to Plaintiff, the Court finds there is no genuine dispute as to any material fact relating to Plaintiff's retaliation claim against Defendants Olson, Bradbury, Higgerson, Hodges, and Voong based on their individual actions. These Defendants' involvement was in reviewing Plaintiff's grievances related to his retaliation claim, and as the explained above, the Court has already found that Plaintiff has failed to produce specific evidence to show that a genuine issue of material fact exists as to his aforementioned retaliation claims: (1) against Defendants Schrag, Wilcox, and Buchanan for allegedly moving him to cell A2-105 as punishment for filing PBSP-16-01431; and (2) against Defendant Toussaint for

his alleged refusal to process Plaintiff's July 17, 2016 Form 22 directly to the warden. Therefore, it follows that Plaintiff has also failed to produce specific evidence to show that a genuine issue of material fact exists as to his retaliation claim against Defendants Olson, Bradbury, Higgerson, Hodges, and Voong based on their participation in reviewing the related grievances to those retaliation claims: PBSP-16-01431, PBSP-16-01584, and PBSP-16-01757. Again, mere speculation that these Defendants acted out of retaliation is not sufficient. *See Wood*, 753 F.3d at 904.

In sum, none of the aforementioned actions by Defendants Olson, Bradbury, Higgerson, Hodges, and Voong would lead a reasonable jury to find that these Defendants' actions of reviewing Plaintiff's grievances violated his First Amendment rights. In opposition, Plaintiff has failed to identify with reasonable particularity the evidence that precludes summary judgment. *See Keenan*, 91 F.3d at 1279. Accordingly, Defendants Olson, Bradbury, Higgerson, Hodges, and Voong are entitled to summary judgment on the retaliation claim against them based on their involvement in the grievance process. Therefore, the Court GRANTS Defendants' motion for summary judgment as to this claim.

## V. CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.      Defendants' objections to Plaintiff's evidence are DENIED as moot. Dkt. 38-1.2

2.      Defendants' motion for summary judgment is GRANTED as to all claims,[6] and judgment will be entered in their favor. Dkt. 30.

3.      The Clerk of the Court shall terminate as moot all pending motions, including Plaintiff's motion entitled, "Plaintiff's Request for Admissions/Consideration of Addendum/Request for Counsel,"[7] (dkt. 40), and close the file.

---

[6] The Court's finding that Defendants are entitled to summary judgment as a matter of law on Plaintiff's First Amendment claims obviates the need to address these Defendants' alternative arguments.

[7] Plaintiff seems to attempt to raise additional claims in his motion, which are not relevant to the claims before the Court. See Dkt. 40 at 3. If Plaintiff wishes to raise these claims, he must file a new civil rights action after he exhausts his administrative remedies.

4. This Order terminates Docket Nos. 30 and 40.

IT IS SO ORDERED.

Dated: March 23, 2020

_____
YVONNE GONZALEZ ROGERS
United States District Judge

United States District Court
Northern District of California